HARMON et al. v. PHILLIPS PETROLEUM CO. et al.

No. 31954. March 26, 1946.

*167 P. 2d 360.*

Roger L. Stephens and Ted Foster, both of Oklahoma City, for plaintiffs in error.

Don Emery, R. B. F. Hummer, and D. E. Hodges, all of Bartlesville, and E. G. DeParade, of Oklahoma City, for defendant in error Phillips Petroleum Company.

W. R. Withington, of Oklahoma City, for defendants in error Jessie B. Godfrey, D. V. Godfrey, H. A. Rogers, and G. E. Rogers.

Stanley B. Catlett, of Oklahoma City, for defendants in error Virginia Matzen and Carl F. Matzen.

608

OSBORN, J. This is a suit to quiet title brought by the plaintiffs, Mildred M. Harmon and J. C. Harmon, against Phillips Petroleum Company and others to quiet the title of plaintiffs to lots 19 and 20, block 4, Madison Park addition to Oklahoma City. The trial court rendered judgment in favor of defendants, and plaintiffs appeal.

The petition was in the usual form alleging that plaintiffs were the owners in fee simple of said lots; that the defendants claimed some right, title, and interest in said lots adverse to said plaintiffs, and asked that plaintiffs' title be quieted. The defendants Walter K. Jones, R. D. Jones, James R. Tolbert, Jr., Jessie B. Godfrey, H. A. Rogers, and G. E. Rogers filed disclaimers. Phillips Petroleum Company, in its answer, alleged that it claimed an interest in the property by virtue of a community oil and gas lease executed on October 18, 1940, by the plaintiffs and the assignment thereof to Phillips; that it had commenced operations for the drilling of a well upon block 4 of Madison Park addition under said lease and other leases communitized by it; alleged that if said lease was in any respect invalid or ineffective, the plaintiff had stood by and knowingly allowed defendants to commence operations for the drilling of said well without indicating that they claimed that said lease was not in full force and effect, and that by reason thereof plaintiffs were estopped to deny the validity of the lease and had been guilty of laches. By subsequent amendment it pleaded the issuance of a permit to drill said well upon its application to the city of Oklahoma City. By further amendment it pleaded a certain contract and mineral deed executed by plaintiffs, and asserted that thereby plaintiffs had divested themselves of all interest in the property and were not the real parties in interest.

Defendant D. V. Godfrey, in his answer, alleged the execution and delivery of said oil and gas lease, its assignment to Phillips and that he was the owner of an undivided 1/32nd of the 7/8th working interest of oil, gas, and casinghead gas by reservation in the assignment of said lease, and that said lease and his interest were valid and subsisting. Defendants M. E. Carpenter and Virginia Matzen pleaded that they were innocent purchasers of a portion of the 7/8th working interest of oil and gas reserved in the assignment to Phillips. By reply plaintiff's admitted signing the community oil and gas lease, alleged that said lease was obtained by fraud, setting up various facts which they contended constituted such fraud, and which will be set forth hereinafter, alleged that said lease was incomplete in form at the time they signed the same in that the name of the lessee and the description of the property was blank and denied that the answering defendants or any of them were purchasers in good faith of the interest claimed by them.

From the evidence it appears that plaintiffs were the owners of the two lots described in their petition, and the defendant D. V. Godfrey was the owner of two lots in the same block abutting the alley directly opposite the lots of plaintiffs; that oil and gas was being produced from wells close to the block, which was in the U-7 Zone of Oklahoma City; that Godfrey was an oil lease broker and that the plaintiff J. C. Harmon was employed as State Supervisor of Mails at the U. S. Post Office in Oklahoma City, and that for some time previous to October 18, 1940, the lot owners in block 4 had been desirous of procuring the drilling of a well for oil and gas upon block 4, and had held two or three meetings in an endeavor to promote such a well. At these meetings it appears that the lot owners were unable to agree and that no concerted action was ever taken.

The evidence shows that J. C. Harmon had at various times discussed with D. V. Godfrey the probability of getting a well drilled on block 4, indicating a willingness on his part to give a lease on his lots free of charge in order to obtain such well, and had suggested to Godfrey that he, Godfrey, endeavor to

promote the drilling of such well; that shortly before October 18, 1940, Godfrey procured the assistance of G. E. Rogers, another lease broker, and the two agreed that they would try to procure the drilling of a well for oil and gas upon block 4, with the understanding and agreement that they would share equally the expenses of procuring such lease, and that if any profit was realized from the sale or disposal thereof they would divide such profit equally. Pursuant to this arrangement Rogers prepared or caused to be prepared a community oil and gas lease on the usual and ordinary form, leaving the name of the lessee and the description of the property of each proposed lessor blank, but providing that the property covered by the lease could be communitized with other lots in block 4. It further provided that "if operations for the drilling of a well upon the leased premises shall not be commenced within 90 days after acquiring 70 per cent of this lease, or this lease shall terminate as to both parties." Godfrey signed the lease as the first lessor and thereafter he and Rogers procured a number of other lot owners in block 4, including plaintiffs, to sign the lease without paying them any consideration for executing the same, Godfrey representing that he had executed it without consideration, and that no consideration would be paid any lot owner signing the lease. Godfrey did not reveal his interest in the lease. In this manner Godfrey and Rogers procured the lease to be signed by the owners of some 18 lots. The names of one lot owner and his wife were signed thereto by the mother of said lot owner, which signatures apparently gave Rogers and Godfrey a lease on two additional lots, making a total of 20 lots. None of the owners of these lots were paid a consideration for signing the lease. In the fall of 1940, Rogers attempted to interest Phillips in taking over this lease and procuring additional leases to drill a well upon the block but was unsuccessful. Apparently he and Godfrey were also unsuccessful in being able to procure further lot owners

to sign without the payment of a bonus. Nothing further was done about the lease until in March, 1941, when Phillips' land superintendent in Oklahoma City contacted Rogers with reference to the purchase of the lease, requiring that Rogers have a lease upon at least 50 per cent of the block. The block contained 48 lots. Rogers and Godfrey procured the lease to be signed by two additional lot owners, each owning two lots, paying the sum of $100 per lot to obtain these signatures. At some time, the exact date not being shown, Rogers caused the lot numbers of each lessor to be typed into the lease opposite their names and inserted in the lease as lessee the name of James R. Tolbert, Jr., Tolbert's name being inserted without his knowledge or consent, but upon the representation by a friendly broker that it would be all right. Rogers had a judgment against him and had also taken the acknowledgments of all the lessors to the lease, and for this reason did not want to insert his own name as lessee. He then made a deal with Phillips, who in the meantime was taking additional leases in the block, and sold the lease to Phillips for $3,600 cash, and a 1/16th overriding royalty. The lease was assigned by Tolbert, Godfrey, and H. A. Rogers, the wife of G. E. Rogers, to Phillips, and in the assignment Godfrey and H. A. Rogers each reserved a 1/32nd interest in the 7/8th working interest oil and gas. Phillips applied for a permit to drill a well on the block, which permit was denied by the building superintendent, and it thereupon appealed to the board of adjustment, which granted the permit. Certain parties appealed from the board of adjustment to the district court of Oklahoma county, and that court affirmed the board of adjustment in granting a permit, but provided that any of the owners of lots who had signed the Tolbert lease should have 20 days after the rendition of the judgment within which to prosecute an action to set aside said lease as to their lots. Phillips in the meantime had, on July 26, 1941, commenced the drilling of a well upon said block, the well not being located

upon any of the property covered by the Tolbert lease, which well was drilling when this action was filed.

Plaintiffs learned of the deal made by Rogers and Godfrey with Phillips sometime during May, 1941, at which time two of the owners of lots who had leased to Tolbert filed suit to cancel their leases. Plaintiffs, however, took no action to set aside the lease as to their lots and made no complaint that the lease was invalid as to them until after the journal entry of judgment in the appealed permit case had been filed by the district judge who heard the case. On October 22, 1941, shortly after that journal entry was signed, a man named Luker interviewed plaintiffs at their residence and either on that date or the following day took plaintiff J. C. Harmon to the office of Stephens and Foster, attorneys at law in Oklahoma City, where they were interviewed by one Dean Gill, and on the same day signed an option by which in consideration of the payment of one dollar they bound themselves to execute and deliver to one F. C. Collins upon demand an oil and gas lease on their lots upon payment to them of the sum of $300 per lot. This option provided that it should be subordinate to any valid oil and gas lease then existing upon said property, and that it must be exercised within one year from its date, or as soon thereafter as merchantable title should be furnished by plaintiffs. At the same time Gill verbally agreed to provide attorneys and pay all costs of this action, which was to be filed by him for plaintiffs, and thereupon the attorneys for Gill prepared and filed the petition.

Subsequently, on January 22, 1942, plaintiffs sold all the royalty under their lots to one B. B. Ellis for the sum of $1,700, the instrument reciting that it was "the intention of this instrument to convey also all royalties, oil runs or profits therefrom payable under the terms of present oil and gas lease covering said property from date of first production, subject to the rights of the present owners to lease and receive lease money under the terms of present option agreement with F. C. Collins, which agreement is now of record." On or about the same date plaintiffs executed transfer orders to Phillips Petroleum Company reciting that they had sold all royalty produced from the Phillips lease in block 4 to Ellis, and authorizing Phillips to give credit to Ellis for the oil sold from the date of first production.

The well drilled by Phillips on block 4 was completed as a producer on December 21, 1941. Between June 1, 1941, and September 18, 1941, portions of the overriding royalty interest reserved to to Godfrey and H. A. Rogers were transferred to and vested in the defendants Virginia Matzen and M. E. Carpenter.

The trial court rendered judgment in favor of the defendants, finding, among other things, that the plaintiffs, by failing to make any claim, prior to the filing of this action, that the lease was not valid as to their lots, had waived and relinquished the right to assert in this action the invalidity of said lease, and that by such delay and laches plaintiffs were estopped to contend that the lease was invalid. We think this finding and conclusion by the trial court presents the decisive question in this case.

This is a suit in equity, and it is a maxim of equity that it regards substance rather than form. While in form the suit brought by plaintiffs is a suit to quiet title, it is in substance a suit in rescission and cancellation, seeking to annul and cancel the oil and gas lease executed by plaintiffs, and to divest all parties claiming rights or interests arising under said lease of such rights and interests. Such was its only purpose.

In Mathews v. Sniggs, 75 Okla. 108, 182 P. 703, 709, we said:

"Nor does it matter what plaintiffs may have termed their action by their application to amend the prayer in part, as its character is to be determined by

the rights and remedies of the parties and the nature of the issues properly triable, and not alone by the form in which the action is brought, or by the prayer for relief, . . . "

Regardless of the form in which the pleadings were cast, the instant case is purely an equitable action for rescission, and we will treat it as such.

From the evidence it appears that on or before May 1, 1941, plaintiffs were informed of the fraud which they claim was practiced upon them, and of the assignment of the lease to Phillips, and of all of the other facts and circumstances which they now contend render the lease invalid as to them. The evidence shows that sometime during the month of May, 1941, Godfrey presented to plaintiff J. C. Harmon a ratification of said oil and gas lease and requested that he and his wife execute the same. Harmon testified that when the ratification was presented to him he simply refused to sign. Godfrey testified that at the time he requested Harmon to sign the ratification Harmon refused, stating that they had executed the lease upon the property and that it was unnecessary for them to execute any other papers, and Godfrey reported this statement to Phillips. Plaintiff knew that several actions had been commenced by various co-lessors in the Tolbert lease seeking the cancellation thereof as to the property of such co-lessors, but still plaintiffs made no claim that the lease was invalid, and took no action of any kind evidencing an intention to repudiate the lease. They were notified of the application made by Phillips to the board of adjustment for a permit to drill a well upon the block, but did not attend the hearing held on such application and, so far as the record shows, ignored all subsequent proceedings in connection with the obtaining of a permit. They knew that Phillips had commenced the well on the block and plaintiff J. C. Harmon testified that he, on two or three different occasions, went up to the well to ascertain the progress which was being made in the drilling thereof.

We think this evidence justified the finding and conclusion of the trial court above set forth. It is inconceivable that plaintiffs, believing that they had been the victims of a fraud perpetrated upon them by their friend and neighbor, Godfrey, would sit idly by under the conditions above stated, with knowledge of all the facts above set forth, and make no complaint of any kind, and take no action whatever to remedy the situation or to obtain redress for the wrong inflicted upon them, unless they were willing to be bound by the lease. Even when Godfrey requested a ratification of the lease, plaintiffs still made no complaint. Of the two versions of that occurrence, the version given by Harmon and the version given by Godfrey, as above set forth, we think the the trial court was justified in believing that Godfrey's statement truthfully reflected what occurred.

If plaintiffs believed that the lease signed by them was invalid and voidable because of fraudulent misrepresentations on the part of Godfrey, and they desired for that reason to rescind and cancel said lease, it became their duty to comply with the provisions of 15 O. S. 1941 § 235. That section, insofar as pertinent to the instant case, reads as follows:

"Rescission, when not effected by consent, can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence to comply with the following rules:

"1. He must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind; . . . ."

That section has been cited and applied by this court in numerous cases involving varying factual situations. J. Crouch & Son v. Huber, 87 Okla. 83, 209 P. 764; Davis v. Goodwin-Barclay Co., 120 Okla. 274, 251 P. 1042; Nickel v. Janda, 115 Okla. 207, 242 P. 264; Brown v. Privette, 109 Okla. 1, 234 P. 577; Duncan v. Keechi Oil Co., 75 Okla. 98, 181 P. 709.

Under these decisions the failure of plaintiffs to act promptly upon discovery of the facts which entitle them to rescind deprives them of the equitable remedy of rescission and cancellation, and relegates them to other remedies for the redress of the wrong inflicted. J. Crouch & Son v. Huber, supra.

The conduct of plaintiffs under the circumstances of this case amounted to a waiver of the fraud and acquiescence in and affirmance of the lease. Black, Rescission of Contracts (2nd Ed.) vol. 3, § 590 et seq.; 9 C. J., 1198, § 77; 10 R. C. L., 694, § 22; Pomeroy's Equity Jurisprudence (5th Ed.) vol. 3, §§ 817 and 965.

In Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798, 802, the court said:

"Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value . . . "

In speaking of the loss of the right to equitable remedies by the failure of the party wronged to proceed promptly, Pomeroy says, in section 817:

" . . . The same rule applies, and for the same reasons, to a party seeking purely equitable relief against fraud, such as the surrender or cancellation of securities, the annulling of a transaction, and the like. Upon knowledge of the facts, he should commence the proceedings for relief as soon as reasonably possible. Acquiescence consisting if unnecessary delay after such knowledge will defeat the equitable relief."

And in section 965:

" . . . When a party with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and of all the material facts, freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a considerable time and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity."

It is clear that the statute above quoted was enacted for the purpose of expressly putting into effect the equitable principles above set forth. Counsel for plaintiffs contend that it must be shown that the defendants were misled or prejudiced by the failure of plaintiffs to act promptly, and that the evidence does not show any prejudice resulting to the defendants by plaintiffs' inaction, or that they were misled thereby. While the statute does not in any way qualify the requirement of prompt action in invoking the remedy of rescission and cancellation by stating that the opposing party must be misled or prejudiced by such delay, we think that the record sufficiently shows that the defendants in this case were both misled and prejudiced by the failure of plaintiffs to speak and act. The record shows that the interests of defendants Virginia Matzen and M. E. Carpenter in the overriding royalty reserved in the assignment to Phillips were acquired by transfers made during the months of June, July, and August, 1941, and that Phillips, in commencing its well and applying for permit to drill the same, believed and represented that it had a valid lease upon the Harmon lots. The statement which Godfrey says Harmon made to him when he asked Harmon to sign the ratification was communicated by Godfrey to Phillips and that statement, coupled with Harmon's continued inaction and failure to complain, justified Phillips in the conclu-

sion that its lease as to plaintiffs' lots was valid. While Eastman testified that Phillips would have drilled the well even if Harmon disavowed the lease and brought an action to cancel the same, that statement was a mere conclusion on his part. Undoubtedly, in determining upon the drilling of the well, Phillips figured the number of lots which it held in the block as against those outstanding, and based its decision upon the number of lots in the block upon which its lease was valid, and all steps taken by it to secure the permit and drill the well were upon the assumption that its lease upon the Harmon lots was a valid and subsisting lease. The trial court was justified in concluding that Harmon had recognized and adopted and affirmed the Phillips lease. From the record it appears reasonable to assume that if Luker had not gone to the residence of plaintiffs, and procured their meeting with Gill, this action would not have been brought.

Plaintiffs further contend that the lease was fatally defective in that the name of the lessee and the description of the lots leased by the various lessors was blank at the time they signed the lease. The trial court found that this fact was known to plaintiffs and that they authorized the filling in of these blanks. This finding is not clearly against the weight of the evidence.

The contention that the lease was invalid because it had expired by its own terms, based upon the peculiar clause above set forth, providing that a well must be commenced "within 90 days after acquiring 70 per cent of this lease", is likewise without merit. Both Godfrey and Rogers testified that all parties understood that they were attempting to take a lease upon the entire block, but that if they got as much as 70 per cent of the block they were of the opinion that they might procure a well to be drilled thereon. Plaintiffs admit that they knew that at least 51 per cent of the block must be obtained in order to procure the drilling of a well, and that it was the intention of the lessee to se-

cure the signatures of enough lessors to enable them to drill the well. We think the trial court was justified in finding that they understood that the 70 per cent referred to the block. But whatever their understanding was in the matter, we think by their acquiescence and affirmation of the lease as an existing lease, they are now precluded from asserting its invalidity.

The judgment of the trial court is not clearly against the weight of the evidence.

Affirmed.

GIBSON, C. J., HURST, V. C. J., and RILEY, BAYLESS, WELCH, and DAVISON, JJ., concur.