**DUFFY THEATRES, Inc.**

v.

**GRIFFITH CONSOL. THEATRES, Inc.**

**No. 4629.**

United States Court of Appeals, Tenth Circuit.

Nov. 12, 1953.

John Barry, LaJolla, Cal. (James E. Grigsby, Oklahoma City, Okl., on the brief), for appellant.

Richard W. Fowler, Oklahoma City, Okl. (Charles B. Cochran and Richardson, Cochran, Dudley, Fowler & Rucks, Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

Duffy Theatres, Inc.,[1] an Oklahoma corporation, brought this action against Griffith Consolidated Theatres, Inc.,[2] a Delaware corporation, under the Clayton Act, 15 U.S.C.A. § 12 et seq., to recover damages for alleged violations by Griffith of the Sherman Anti-Trust Act, 15 U.S.C.A §§ 1 and 2. From a summary judgment in favor of Griffith, Duffy has appealed.

On April 4, 1938, Duffy and Griffith entered into a written contract for the sale by the former to the latter of all of Duffy's title and interest of every nature in the leases, leaseholds, furniture, fixtures, equipment, good will, rights,

1. Hereinafter called Duffy.

2. Hereinafter called Griffith.

privileges; and other personal property located in or used in connection with the Temple and Rialto Theatres in Mangum, Oklahoma.

The contract provided that the execution and delivery of the various assignments, good will contracts, chattel mortgages, bills of sale, and other instruments, the payment of the purchase price, and the delivery of the possession of such leaseholds, furniture, equipment, rights, privileges and other personal property as provided in such contract "shall be held and considered by the parties as a full and complete settlement of all claims and demands of each party against the other, of every nature and character whatsoever except the liability of the third party (Griffith) for the deferred payments on the purchase price and any liability against the first and second parties (Pat Duffy and Duffy) by reason of their warranties in the assignments, good will contracts, bills of sale, etc."

Duffy commenced this action on June 25, 1951.

In its complaint Duffy alleged that the United States, on April 28, 1939, instituted an equitable action in the United States District Court for the Western District of Oklahoma, numbered 172 on the Civil docket of such court, against Griffith and others under the Sherman Anti-Trust Act, and that such action pended until December 27, 1950, when a final decree was entered therein.

The trial court, in Number 172, found there had been no violation of the Sherman Act in any of the respects charged in the complaint and dismissed the action. See U. S. v. Griffith Amusement Co., D.C., 68 F.Supp. 180. On appeal, the Supreme Court concluded that the defendants in Number 172 had combined with each other and certain distributors of motion picture films to obtain certain "monopoly rights" in violation of §§ 1 and 2 of the Sherman Act, and that such conspiracy affected interstate commerce. The Supreme Court did not undertake to determine what effect the unlawful practices had on competing exhibitors.

It remanded the case, with instructions to determine what effect such practices had on competing exhibitors and to fashion a decree which would undo as near as may be the wrongs that had been done and prevent their recurrence in the future. See United States v. Griffith Amusement Co., 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236.

In its complaint Duffy further alleged the findings and conclusions of the Supreme Court in its opinion in United States v. Griffith, supra, by way of recital, in substantially the language of the opinion.

In its complaint Duffy further alleged that:

"* * * by reason of its unlawful and monopolistic trade practice, as set forth in the opinion of the Supreme Court of the United States in the antitrust action against defendant, which practice was well known to plaintiff and to the theatre owners in southwestern Oklahoma generally, plaintiff could not compete with it and was forced to sell its business, equipment and good will to defendant for the sum of $12,000.00 on April 4, 1938 and deliver possession thereof on May 1, 1938," and that

"Plaintiff has been damaged in the sum of $38,000.00 as a result of the unlawful and monopolistic trade practice of defendant as condemned by the Supreme Court in the antitrust action against defendant, referred to above."

In its complaint Duffy further alleged the injunctive provisions of the final decree in Number 172.

Duffy prayed for recovery of treble damages and attorney's fees.

In its complaint Duffy did not allege that the method of licensing pictures which had been held illegal in United States v. Griffith was used by Griffith in the licensing of pictures for exhibition in Mangum or that there was any monopolization in the licensing of pictures for exhibition in Mangum and did not

allege any facts with respect to how Duffy was unable to compete with Griffith and why it was forced to sell its business to Griffith.

In the final decree in Number 172 the district court enjoined Griffith and others from engaging in certain practices,[3] but in its findings in Number 172 the court found that none of such unlawful practices had been directed against Duffy and that Duffy had not been adversely affected by such practices and did not sell its theatres to Griffith because it was adversely affected by Griffith's competition, but because of operating losses resulting from other causes, principally, crop failures and a consequent economic depression in the area, and its inability to obtain a lease on the building in which one of its theatres was located.

While the findings of the court in Number 172 are perhaps not binding on Duffy, since it pleaded and relies on the injunctive provisions of the final decree in Number 172, we think those provisions should be considered here in the light of the court's findings on the final hearing in Number 172, with respect to the specific grounds for relief pleaded in the instant case, and accordingly set forth such findings in appended note.[4]

3. The decree in Number 172 enjoined Griffith and the other defendants therein:

(A) From combining or conspiring with each other or with any other exhibitor in licensing any picture for exhibition.

(B) From licensing any picture for exhibition through any person known by it to be acting for any other exhibitor, other than an exhibitor in which such corporation owns a financial interest.

(C) From licensing or booking any picture for any theatre or any exhibitor, other than a theatre or an exhibitor in which the corporate defendant owns a financial interest.

(D) From entering into any franchise agreement.

(E) From licensing any picture for exhibition in any theatre in any other manner than that each licensed shall be offered and taken theatre by threatre, solely upon the merits.

(F) From licensing any picture for exhibition upon the condition, arrangement, agreement or understanding that the picture be licensed for any other theatre.

(G) From licensing any picture for exhibition upon the condition, arrangement, agreement or understanding that any other picture be licensed for any other theatre.

4. After the trial had been concluded, after remand, in Number 172, the trial court made, among others, the following findings of fact, which had been incorporated in its decree:

"(3) On January 5, 1937, Duffy voluntarily and without coercion, intimidation or threats executed an option to Griffith Consolidated Theatres, Inc. (hereinafter referred to as 'Consolidated') for the sale of his two theatres, the Temple and Rialto, to Consolidated. At that time Duffy was operating his best theatre, the Temple, on a month to month basis without a lease. The completion of the sale was contingent upon Duffy's obtaining a ten-year lease of the Temple Theatre from his landlord at the same rental which Duffy had been paying. Duffy attempted to secure such a lease but was unable to do so and the option and purchase plans were thereupon abandoned by Consolidated.

"(4) At the time the option was executed, Duffy was operating the Temple Theatre without a lease and on a month to month basis. He was also operating the Rialto Theatre.

\* \* \* \* \* \*

"(6) When the lease on the Temple Theatre was not obtained by Duffy and could not be obtained by Consolidated, the purchase of the Duffy theatres was abandoned.

"(7) In July, 1937, Consolidated converted a store room into a theatre and opened the Greer Theatre. The Greer was an inferior theatre to the Temple. The Greer did not take any product away from Duffy's Temple Theatre.

"(8) The Rialto was an obsolete Theatre and had a poor location. It was inferior to the Temple and Greer.

"(9) In April, 1938, Duffy voluntarily and without intimidation, threats or coercion on the part of anyone, sold the equipment in the Temple or Rialto Theatres to Consolidated and Consolidated took possession of those theatres on May 1, 1938. At the time of the sale Duffy still had not been able to obtain a lease on the Temple Theatre from the Masonic Lodge.

"(10) After the acquisition by Consolidated of the equipment in the Temple

Griffith set up as a defense the release in the contract. In its reply Duffy alleged that the release was obtained by undue influence and was an integral part of the monopolistic conspiracy.

At a pre-trial hearing, counsel for Duffy made a statement of all the evidentiary facts it would endeavor to prove at the trial. The summary judgment was predicated on that statement,

and Rialto Theatres, the Temple was closed for remodeling and during that period the Greer and Rialto were operated. After the remodeling of the Temple was completed, the Rialto was closed and abandoned.

"(11) Duffy testified that he sold his theatres in Mangum because he feared that he would be unable to license product for the coming seasons.

"(12) In support of his assertion that he sold his theatre in Mangum because he feared that he would be unable to license product for the coming seasons, Duffy testified that after Consolidated opened the Greer Theatre it played pictures of Warner for the 1936–37 season which Duffy had under contract for exhibition in his theatre. Plaintiff urges that the 1938 sale of Duffy's theatres was the proximate result of this particular incident. That testimony was completely and satisfactorily contradicted by documentary evidence. Every picture of the 1936–37 season which had been licensed to Duffy by Warner was tendered to him and played. Duffy chose not to play some of the pictures which were offered him, but he selected and played substitute pictures in lieu thereof. It was not until such substitution had been voluntarily made by Duffy that any 1936–37 Warner pictures were licensed to Consolidated and played in the Greer Theatre. Duffy's own voluntary acts were responsible for his failure to play each of those pictures in accordance with his contract. A complete analysis of the incident based on the documentary evidence is as follows:

"(a) On February 19, 1937, Duffy licensed 18 specific 1936–37 Warner features for first run Mangum, plus a regular season's deal of 1937–38 features. The terms of the 1936–37 agreement permitted Duffy to play any other 1936–37 Warner features in substitution for the particular flat rental features specified in the contract.

"(b) Duffy listed six features by title which he claimed were played by Consolidated while under contract to him. Warner's business records completely refute the claim. Four of the six features had been offered Duffy and were rejected by him. The other two never were licensed to Duffy and were free from [for]

licensing to other exhibitors at all times. The facts are uncontradicted: Duffy licensed 18 pictures and played 18 pictures. Since Duffy completed his contract according to its terms, the licensing by Consolidated of such features as were not licensed to Duffy could not have caused him to sell his theatre.

"(13) In further support of his claim of fear of inability to obtain product, Duffy testified that prior to the time the Greer was opened Duffy had been using the product of Columbia; that after the Greer opened, Smith, the salesman for Columbia, told him that he would not be calling on him any more; that the conversation took place after Consolidated had put in the Greer Theatre. The facts are that Smith continued to call on Duffy until Duffy sold his theatre in 1938 and never at any time told him that he would not be calling on him any more since Griffith had put in a theatre in Mangum. Columbia entered into a contract with Duffy for the 1937–38 product first run after Consolidated had opened the Greer Theatre.

"(14) That Duffy's sale was not caused by a fear of product loss is also evidenced by the fact that Duffy gave Consolidated an option to buy the Temple and Rialto Theatres in January, 1937, at a time when he testified he was having no product difficulties and was making a substantial profit. Consolidated was not then competing with him.

"(15) Duffy further testified that a salesman for RKO made a similar statement to that which he attributed to Smith, but Duffy was not able to give the name of the RKO salesman. The RKO product for the 1937–38 season was licensed to Duffy.

"(16) Consolidated started the construction of the Greer Theatre about July of 1937, although it was not opened until November 1, 1937. It was generally known that the theatre would be constructed three or four months prior to July, 1937).

"(17) Although it was generally known that Consolidated was going to open a theatre in Mangum prior to the beginning of the 1937–38 season, each of the major distributors licensed its product to Duffy who had been a customer prior to

the allegations of the pleadings, and the deposition of Pat Duffy and the exhibits attached thereto.

The judgment recited that Duffy's counsel had stated that Duffy's evidence would show the following facts:

Duffy commenced operating a motion picture theatre in Mangum, Oklahoma, in 1927, in competition with another theatre. In 1933, Duffy acquired the other theatre, and thereafter and until November 1, 1937, operated the only two theatres in Mangum, known as the Temple Theatre and the Rialto Theatre. The former was a first-run house and the latter a second-run house. Griffith opened the Greer Theatre in Mangum in the time Consolidated came into the town. The plaintiff contends that such product was licensed prior to the time the distributors knew that Consolidated was going to open a theatre. That contention is not well founded.

"(18) The product of Warner for the 1937–38 season was licensed to Duffy on March 2, 1937. The contract of Metro's product of the 1937–38 season was dated June 17, 1937, but an application for the 1938–39 Metro product was taken about December 4, 1937, and that product was licensed to Duffy. The Columbia product for the 1937–38 season was licensed to Duffy under contract dated August 13, 1937, although Columbia entered into a circuit franchise with Consolidated for the 1937–38 and 1938–39 seasons in other towns. The record does not show when Duffy's contract with Universal was made. Under date of March 23, 1936, Fox wrote a letter to Duffy assuring him that, in the event Consolidated opened a theatre in opposition to Duffy, he would be given the refusal of the Fox product before it was offered to Consolidated. Fox did license its product to Duffy for the 1937–38 season.

"(19) Duffy had all of the first-run major product he wanted prior to the time Consolidated came to Mangum and continued to have all the choice major product first run after Griffith came into Mangum until he sold his theatre.

"(20) Duffy's testimony that he was afraid that he would not continue to have that product after Consolidated came into Mangum is not convincing. He had no reasonable basis for any fear of not continuing to get the product which he had been previously licensing. He did receive the product of the 1937–38 season from substantially all of the major distributors after it was generally known that Consolidated was going to open a theatre in Mangum.

"(21) Duffy sold his theatres because of his landlord's refusal to renew Duffy's lease on the Temple Theatre and because of poor business conditions. At the time of the sale it was not a question with Duffy of his inability to continue to license product, but of his inability to obtain a lease from the Masonic Lodge on the Temple Theatre and of his inability to pay for pictures which he had actually licensed. The competition of Consolidated did not bring about that condition.

"(22) On April 3, 1936, Duffy wrote Loew's that 'business was terrible' and that he was running out of money. In January, 1938, Duffy wrote Loew's that he had 'run out of money' and had lost $6,000 in 1937 (before Griffith competed with him). In March, 1938, Duffy wrote Loew's that 'we are broke and I don't know what we are going to do.' A few days later he wrote Loew's again:

" 'I am out of money, lost about $6,000 in the past two years, I am either going to have to get cheaper pictures or lose the theatre * * *. It is not on account of competition that we are losing money it is because everybody here is broke.'

"The contract for the sale of the theatre was entered into a month after the above correspondence was written. Since Duffy's financial difficulties occurred over a two-year period prior to Consolidated's entry into Mangum and reached a peak at a time when he had substantially all the major product under contract, the cause of the difficulties could not have originated with the defendants.

"(23) In addition to Duffy's financial troubles, he was having difficulties with the landlord of the Temple Theatre, which was the best theatre he had. This situation was the substantial cause of the sale and not the acts of the defendants.

\* \* \* \* \* \*

"(28) The Temple and Rialto Theatres were not acquired by Consolidated as a result of its abuse of circuit buying power or as a result of the licensing methods of the defendants, or any of them, which violated the Act.

"(29) The Rialto and Temple Theatres were not acquired for the purpose or with the effect of monopolizing the motion picture business in Mangum, but those theatres were acquired by Consolidated pursuant to legitimate business expansion."

competition with Duffy on November 1, 1937. Duffy continued to operate its two theatres until April 30, 1938, when it sold them to Griffith.

From 1934 and until Duffy sold its theatres to Griffith, the latter and its associated companies, who were defendants in United States v. Griffith, used their circuit buying power to license motion pictures from the major distributors, in the towns in which they were operating, and were obtaining advantages over their competitors with respect to picture rental and the obtaining of desirable pictures for exhibition. They put their competitors out of business in many of the towns in which they operated by use of such circuit buying power.

In 1935, Griffith undertook to buy Duffy's theatres. Duffy offered to sell for $50,000. Griffith made no counteroffer. Griffith undertook to buy an interest in Duffy's theatres in 1935. Duffy refused to sell. Griffith told Duffy it needed protection. In 1936, Griffith undertook to buy 51 per cent interest in Duffy's theatres and Duffy refused to sell. Griffith told Duffy it was on the spot and was "slated to be put out of business."

Duffy operated the Temple Theatre in the Masonic Temple Building in Mangum under a year-to-year lease at a monthly rental of $150, which lease expired on August 31, 1936. H. U. Bailey, for several years prior to 1936, held a real estate mortgage on the building to secure a debt of $26,000. The mortgage became delinquent and the owner of the building turned over to Bailey the renting of that part of the building occupied by the Temple Theatre. In June, 1936, Bailey contacted Griffith and tried to lease the theatre portion of the building to Griffith. Griffith told Bailey it would not negotiate for the lease as long as it was under lease to another. In July, 1936, the owner served notice on Duffy that its lease would not be renewed at its expiration date, August 31, 1936. After August 31, 1936, Duffy continued to oc-cupy the premises, but the owner refused to accept any rental payments.

In the latter part of 1936, Griffith offered Duffy $20,000 for its theatres and Duffy refused the offer. Griffith told Duffy if it did not sell, Griffith would put in a competing theatre and put Duffy out of business.

On January 5, 1937, Griffith offered Duffy $22,000 for its theatres. Duffy accepted the offer and a written option was entered into, giving Griffith 30 days in which to exercise the option. Griffith was unable to arrange a satisfactory lease with Bailey and for that reason refused to exercise the option.

Duffy, for the picture season of 1935–1936, had all the pictures it needed for exhibition and had licensing agreements with most of the major distributors. It had like agreements with such distributors for the 1936–1937 season.

It was able to secure such agreements for the 1937–1938 season, but the rental was higher. All of Duffy's licensing agreements for motion pictures with the major distributors for the 1937–1938 season expired about September 1, 1938.

After Griffith failed to exercise the option to purchase Duffy's theatres, and in April, 1937, the owner gave a lease to Duffy for one year, commencing September 1, 1936, at $150 per month. The lease was not renewed on September 1, 1937, and Duffy again continued to occupy the premises by sufferance.

In the fall of 1937, Griffith commenced remodeling a building in Mangum and converting it into a motion picture theatre and on November 1, 1937, opened it as the Greer Theatre.

1937 was a bad crop year in the Mangum vicinity, due to drouth.

Shortly after Griffith opened the Greer Theatre, it offered Duffy $16,000 for its theatres, which Duffy refused.

During the 1937–1938 film season, all of the salesmen for the major motion picture distributors quit calling on Duffy and Duffy was unable to make licensing agreements with any of the dis-

tributors for the 1938–1939 film season, except Metro.

Duffy's gross income from its theatres in Mangum from 1933 to the date of the sale to Griffith was as follows:

| | |
|---|---|
| November and December, 1933 | $ 4,916.74 |
| 1934 | 32,116.73 |
| 1935 | 34,390.72 |
| 1936 | 29,388.42 |
| 1937 | 23,698.42 |
| January to April, 1938, inclusive | 6,772,26 |

In his deposition Pat Duffy testified, among others, to the following facts:

He is President of Pat Duffy Theatres, Inc., and was such President during all the time it operated theatres in Mangum. He had a conversation with Bailey about December 1, 1937. Bailey told him that he had a loan on the Temple Theatre building; that he wanted to make a deal with Griffith; that he thought he could make a good deal and get a loan on the building to take up his mortgage loan; and that Griffith would pay Duffy $16,000 for its theatres. Pat Duffy told Bailey he could not accept $16,000. Later, Duffy offered to sell its theatres to Griffith for $13,000. Griffith declined the offer. Duffy made the offer to sell for $13,000, because Griffith had played pictures which it had under contract and it did not believe it could meet Griffith's competition. Later, Griffith offered $12,000 and Duffy accepted the offer.

The terms of the contract were orally agreed upon by the parties thereto several days before the written contract was prepared. There is nothing in the record indicating the written contract, including the release provision, did not accurately reflect the terms orally agreed to by the parties. When the written contract was delivered to Duffy for execution, it objected to certain items in the inventory attached thereto and requested their elimination, but it raised no objection whatever to the release provision. It will be noted that counsel for Duffy failed to state that it would offer any evidence tending to show that Duffy objected to the provision for a general release in the sales contract or any evidence tending to show that Duffy was coerced into agreeing to such general release.

The trial court found that the release was legally effective and that the facts proposed to be established by Duffy were insufficient to avoid the release.

The contract contained no recital or reference to any particular claim or claims that were in dispute or were to be released. The release provision employed langauge with reference to the claims to be released of broad and comprehensive import, namely, "a full and complete settlement of all claims and demands of each party against the other, of every nature and character whatsoever * * *." It excepted certain claims growing out of the contract, to-wit, the liability for the deferred payments on the purchase price and the liability for warranties in the assignments and bills of sale, but did not except the claim asserted in the instant case. The claim here asserted was in existence and Duffy knew all the facts with respect thereto when the contract was executed; and there is nothing in the record to indicate that Duffy then had any other claim against Griffith.

Under the circumstances here presented, the absolute, unequivocal, and comprehensive language of the release must be construed to include all claims in existence at the time the contract was executed,[5] except those specifically excluded. If any other existing liability

5. Tupper v. Hancock, 319 Mass. 105, 64 N.E.2d 441, 443; Houston v. Trower, 8 Cir., 297 F. 558, 561, 562; Southern Cotton Oil Co. v. United States, 5 Cir., 84 F.2d 509, 511; United States v. Wm. Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 128, 27 S.Ct. 676, 51 L. Ed. 983; St. Louis, K. & Southeastern R. Co. v. United States, 267 U.S. 346, 349, 45 S.Ct. 245, 69 L.Ed. 649; Gardner v. City of Columbia Police Department, 216 S.C. 219, 57 S.E.2d 308, 310.

was intended to be excepted, it should have been expressly set forth in the release.[6] The exception of the two claims from the release indicates the intent of the parties to include all other existing claims.[7]

We conclude that the release embraced the claim sued on in the instant action.

The release provision was an integral part of the contract and the language of the contract clearly shows that the down payment and the deferred payments to be made by Griffith were consideration, both for the transfers of the theatre properties and the release of all claims and demands of Duffy against Griffith.

█ A release of a civil claim for damages for violation of the anti-trust laws is not invalid because of illegality. Such a release violates no law and is not contrary to public policy.[8]

█ Even if Duffy consented to the inclusion of the release provision in the contract through undue influence or duress, the release for that reason was not void, but merely voidable. After knowledge of the facts constituting grounds for rescinding or disaffirming the release, the releasor must rescind or disaffirm with due diligence and within a reasonable time.[9]

The duty of the releasor to act with diligence is imposed by statute in Oklahoma.[10]

Under Oklahoma law, a return of the consideration paid for the release was not a prerequisite to a disaffirmance of the release and prosecution of the instant action. Duffy could have brought this action, sought rescission of the release, and offered to credit on the judgment that part of the consideration paid attributable to the release.[11] He was free so to do at all times after the contract was executed.

█ While the statute of limitations applicable to the instant action was tolled during the pendency of cause Number 172, by the provisions of 15 U. S.C.A. § 16, the time for rescinding or disaffirming the release was not likewise tolled. Duffy waited more than 13 years after the contract containing the release was executed before commencing the instant action. Under such circumstances it must be held to have ratified the release.

Affirmed.

6. Tupper v. Hancock, 319 Mass. 105, 64 N.E.2d 441, 443; Goff v. Boma Inv. Co., 116 Colo. 359, 181 P.2d 459, 462; United States v. Wm. Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 128, 27 S.Ct. 676, 51 L.Ed. 983.

7. Southern Cotton Oil Co. v. United States, 5 Cir., 84 F.2d 509, 511; Baker v. Baker, Tex.Civ.App., 169 S.W.2d 1016, 1022.

8. Suckow Borax Mines Consol. v. Borax Consolidated, 9 Cir., 185 F.2d 196, 208.

9. Capital Traction Co. v. Sneed, 58 App. D.C. 141, 26 F.2d 296, 302; Pelletier v. Phoenix Mutual Life Ins. Co., 49 R.I.

135, 141 A. 79, 80; Goff v. Boma Inv. Co., 116 Colo. 359, 181 P.2d 459, 462, 463; Colorado Springs & I. Ry. Co. v. Huntling, 66 Colo. 515, 181 P. 129, 133; Alabama & V. Ry. Co. v. Kropp, 129 Miss. 616, 92 So. 691, 694; Ballantine v. Stadler, 99 N.J.Eq. 404, 132 A. 664, 666; Nickel v. Janda, 115 Okl. 207, 242 P. 264, 267; Harmon v. Phillips Petroleum Co., 196 Okl. 607, 167 P.2d 360, 365.

10. 15 Okl.St.Ann. § 235.

11. Southwestern Nat. Life Ins. Co. v. Wampler, 163 Okl. 3, 20 P.2d 189; Pecinosky v. Oklahoma Aid Ass'n, 131 Okl. 240, 268 P. 309.