Edward H. GREEN and Newman-Green, Inc., Plaintiffs and Counterdefendants,

v.

AEROSOL RESEARCH COMPANY (Valve Corporation of America, Substituted Defendant), Defendant and Counterplaintiff.

No. 64 C 2115.

United States District Court
N. D. Illinois, E. D.

July 16, 1968.

Silverman & Cass, Aaron, Aaron, Schimberg & Hess, John S. O'Brien, Chicago, Ill., for plaintiffs.

Herman J. Gordon of Dressler, Goldsmith, Clement, Gordon & Ladd, Sheldon O. Collen, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROBSON, District Judge.

The defendant has moved for summary judgment. This court is of the opinion that the motion should be granted.

This suit is but one of a number of controversies among these parties. In 1952, one of the plaintiffs, Edward H. Green, and Stanley Goldberg formed the

Aerosol Research Company (A.R.C.).[1] This relationship lasted until October, 1953, when apparently the dissension between them caused Green to sell out his stock to Goldberg. On January 21, 1954, Green filed a patent application for his B–14 (or B–14–1) aerosol valve assembly, which became (with certain modifications) patent No. 2,777,735 (Green '735). A.R.C. filed suit in the state court in 1956, claiming that the work done on the application for the Green '735 was in violation of the 1953 separation agreement.

In November, 1955, Clarence O. Kuffer, an employee of A.R.C. both before and after Green left the company, filed a patent application for an aerosol valve assembly, which (on November 17, 1955) became patent No. 2,913,154 (also known as AR–227). Kuffer also filed on November 20, 1956, an application for a patent on the AR–74 valve design. This application was Serial No. 623,429. In the light of Green '735 all the broad claims in this application were cancelled and the continuation-in-part application (Serial No. 840,655 filed on September 17, 1959) became patent No. 3,074,601 (Kuffer A.R.C. '601) on January 22, 1963. This AR–74 valve and the B–14 valve were stipulated to be "substantively the same in construction and in mode of operation." Both valves had a "clear-through metering slot or slit in the valve stem," although the defendant represented that its modified AR–74 had a "metering groove."

Foreign applications for patents, based on the AR–227 (Kuffer '154) and the AR–74 (Kuffer A.R.C. '601), were made in 1956 and 1957 in France, Germany, Great Britain, Italy and Spain. These applications, and the subsequent patents issued by 1959 in all the countries but Germany, were made in the name of A.I.D., a Liechtenstein corporation, which was formed by A.R.C. as its "representative" to sell and promote the sale of aerosol valves. Licenses were given by A.I.D., with the consent of A.R.C., to companies in these countries.[2]

In 1961, A.R.C. sued Newman-Green, Inc. and Edward H. Green for infringement of two patents which A.R.C. owned. Green counterclaimed that one of these patents was invalid, and that A.R.C. was infringing Green '735. This suit was dismissed along with the state court suit by agreement of the parties on May 7, 1962. This agreement will be discussed more fully later on in this opinion, since it forms the basis of A.R.C.'s present motion for summary judgment. For the moment, it suffices to say that the agreement purportedly dealt with more than the settlement of these two cases.

Another suit was filed in 1962, after Green obtained another patent (No. 3,-045,877—Green '877), and after the May 7, 1962, agreement was signed. The District Court implied a license under Green '877 in favor of A.R.C., and the Seventh Circuit Court of Appeals affirmed. Green v. Aerosol Research Co., 374 F.2d 791 (7th Cir. 1967). The agreement of May 7, 1962, was held to cover Green '877, even though it was not specifically mentioned in the agreement. At the time the negotiations which resulted in the agreement were taking place, both A.R.C. and Green had patent applications pending, among which were Green '877 and Kuffer A.R.C. '601.

In late 1964, in the case presently before this court, Green sued Aerosol for infringement of and interference with Green '877 (Counts I and II) and for violation of the antitrust laws and for unfair competition by the assertion of A.R.C.'s foreign patents (Count III). Counts I and II were dismissed because of the Seventh Circuit's decision that A.R.C. had an implied license under Green '877. There could, therefore, be no infringement of or interference with Green '877. Count III is the only count left for this court to decide.

---

1. A.R.C. merged in November, 1965, with Valve Corporation of America (V.C.A.)

2. At the present time, and since 1965, A.R.C. does not own or control these foreign patents or licenses.

Count III charges antitrust violations and unfair competition against A.R.C., in that the original application (Serial No. 623,429) filed on November 20, 1956, was fraudulently made "with the purpose and intent of using said fraudulently filed United States patent application as the basis for claiming * * * in patent applications to be filed in foreign countries the priority of the filing date" over Green '735. Count III goes on to allege that these foreign applications were "in the identical form of said fraudulent forfeited[3] application as filed." The gist of the unfair competition claim is that A.R.C. is unlawfully asserting these foreign patents against Green, Newman-Green, Inc. and the purchasers and licensees of the Green valves. This unfair competition claim, however, depends on the establishment by the plaintiffs that the original forfeited application was fraudulently made. See also Defendant's Exhibit DRX-11, Memorandum of Plaintiffs in Response to Defendant's Motion to Strike, 62 C 1631, page 15, line 7. There is no question that if the patent is invalid, there exists a cause of action under the antitrust laws, if all the other elements of a 15 U.S.C. § 2 violation are set forth. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In the opinion of this court, plaintiffs' case stands or falls with their claim that there was a fraudulent United States patent application, since it is most clear that the foreign applications and patents depended wholly on the content of the United States application.

The defendant, however, argues that since this claim of fraud was available and known to the plaintiffs at the time of the 1961 suit (and earlier), it was released by the terms of the May 7, 1962, agreement. The plaintiffs claim that the agreement does not cover this suit, and that even if it does cover it in part, there are still claims outstanding which preclude the granting of a full summary judgment in favor of the defendant. This demands a more detailed look at the May 7 agreement.

After stating certain allegations of ownership of various patents, the agreement lists six documents, "including but not limited to" four agreements, a patent assignment and a bill of sale. The agreement then goes on to say that,

"WHEREAS, the parties have for some time been engaged in a controversy over their respective rights under the agreements, documents, and patents above set forth, as a result of which controversy there is now pending in [the state court, 56 C 17475, and in the federal court, 61 C 444]; and

"WHEREAS, as the result of negotiations between the parties *relative* to the said controversy between them, it has been determined by them amicably to settle and compose *all* of their differences by entering into this Agreement and performing the several acts and prohibitions required hereunder." (Emphasis added.)

It thus appears that although certain documents were specifically mentioned, the scope of the agreement was to be much more broad. This is borne out when other sections of the agreement are taken into consideration, in addition to the introductory language which expressly did not limit the "controversy" to the named documents. See paragraphs 7, 8, 13, 15, 16 and 17.

The agreement continued and affirmed the validity and ownership of the two patents owned by A.R.C. (in the 61 C 44 suit) and the validity and ownership of the Green '735 patent, and granted certain specified cross-licenses to A.R.C. and

---

3. It will be remembered that Kuffer A.R.C. '601 was based on a continuation-in-part application filed in 1959, which was a continuation-in-part of the 1956 application relied on in the foreign countries. It was subsequently forfeited for nonpayment of the issuance fee, but the "complete disclosure, description and allowed claims thereof were included in the said [continuation-in-part] application Serial No. 840,655 before the said forfeiture." Complaint, page 2.

to Green. See paragraphs 9 through 12, inclusive. The agreement then recited that both the state and federal court suits were to be dismissed with prejudice, and that Green was to pay to A.R.C. the total sum of $25,000.

Next, the agreement outlined the mutual general releases given by each of the parties. Only one of these paragraphs needs to be quoted in full, since they are both in essentially the same language. Paragraph 15 reads:

"15. NEWMAN-GREEN and JANE A. GREEN hereby release and forever discharge AEROSOL RESEARCH, its officers, directors and stockholders, and GOLDBERG of and from and against *any and all* manner of actions, cause or causes of action, suits, debts, accounts, promises, warranties, damages, claims, demands or agreements *whatsoever*, compensation and payments of any kind or matters *whatsoever at law or in equity accruing prior to the date of this Agreement,* which the said GREEN, NEWMAN-GREEN and JANE A. GREEN, the heirs, executors, administrators, and assigns of GREEN and JANE A. GREEN, and the successors and assigns of NEWMAN-GREEN, *have had, now have, or may or can have* against AEROSOL RESEARCH \* \* \* or \* \* \* GOLDBERG \* \* \*, provided, however, that nothing contained in this paragraph shall release AEROSOL RESEARCH \* \* \* and/or GOLDBERG, \* \* \* from any of their obligations under the terms of this Agreement." (Emphasis added.)

The breadth of this language, in short, encompasses any claim that accrued prior to May 7, 1962, and is not limited in the least to any particular cause of action. It is true that particular suits were a prime consideration, but because of the problems among the parties as outlined in the agreement, and the history of Green and Goldberg's relationship, these two paragraphs were deemed vital to the "amicable" settlement of "all of their differences." There is no question that

prior to May 7, 1962, the plaintiffs knew of Kuffer's 1956 application, and, as a matter of fact, the plaintiffs recited their knowledge of the alleged fraud in their counterclaim in 61 C 44, one of the suits terminated by the agreement. In addition, the plaintiffs are here asserting that A.R.C.'s foreign patents infringe Green '735, the major patent involved in the agreement. Absent anything else, it would seem beyond question that the agreement covered this cause of action as set forth in Count III. The plaintiffs, however, argue that paragraph 13 of the agreement offers the support they need in opposing this summary judgment.

■ Paragraph 13 provides that,

"Nothing herein shall be construed to grant to either of the parties, rights under any patents other than those specifically named herein, either U. S. or foreign, and then only to the specific extent mentioned, and nothing herein shall be construed to limit any of the parties hereto to pursue and assert any rights in foreign countries against the other parties or those deriving title or rights therefrom on the basis of foreign rights obtained and perfected. Likewise, with respect to the patents other than those specifically named herein, nothing herein shall limit or in any way derogate against any defense available to a party in a suit for patent infringement either in the United States or foreign countries, and in this regard, the parties shall be considered as strangers one to the other."

In a different connection, this paragraph received an interpretation in the Seventh Circuit Court of Appeals. The question that court had to resolve was the effect of the apparently limiting language that as set forth in Count III. The plaintiffs, rights were not granted "under any patents other than those specifically named" in the agreement. The District Court had determined that the agreement was intended to cover the general type of device that both parties were making, and that the after-acquired patent (Green '877), although not specifically named,

dealt with the same subject matter and was therefore covered by the May 7 agreement. The District Court then implied a license in favor of A.R.C. under paragraph 12. The Court of Appeals noted that "[w]hile settlement negotiations were pending both the [parties] had patent applications on file respecting stem structures of aerosol valve spray tips. One of these matured into Green '877 on July 24, 1962." [4] Green v. Aerosol Research Co., supra, 374 F.2d at 793. The court then concluded:

> "From our own study of the settlement agreement as a whole in the light of traditional rules of construction, it appears clear that the intention of the parties was to give the defendant [A.R.C.] an unencumbered right to continue making and selling the accused Aerosol devices. * * * To accept the interpretation urged by the plaintiffs would render the agreement meaningless. * * *

> "We agree with the District Court's interpretation of paragraph 13 as intended to exclude patented subject matter of substantially different nature and not devices already protected by the prior litigated patent Green '735." Id., 374 F.2d at 794.

This interpretation, binding on the parties in the instant case, points the direction that this court's interpretation should take. This court is of the opinion that the Court of Appeals was concerned lest the true comprehensive nature of the settlement agreement be lost. In line with this guiding principle, it seems clear that the apparent exclusion of "any rights in foreign countries" means that rights obtained after the date of the settlement agreement, and relating to "patented subject matter of substantially different nature," were excluded, and not all foreign rights of whatever nature.

■■ This interpretation, therefore, saves the generality of the mutual releases, and comports with the intent of the parties to resolve all of their differences accruing prior to May 7, 1962. Although the plaintiffs contend that there are other claims that accrued after May 7, 1962, it is clear to this court that they all depend on the fraudulent nature of the 1956 U.S. application (and the subsequent patent Kuffer '601), which claim of fraud was most definitely released by the May 7 agreement. Further supporting this reading of the agreement is paragraph 17. It is said there that

> "*Without limiting the generality of the releases as set forth in paragraph 15 and 16 above,* NEWMAN-GREEN and/or GREEN shall not take any action, or make any demands or assertions, or claim any damages, costs, expenses or attorneys' fees against AEROSOL RESEARCH or GOLDBERG or their customers or licensees for alleged infringement of Green '735 based on the manufacture, use or sale of any article by AEROSOL RESEARCH or GOLDBERG or their customers or licensees prior to the date hereof [May 7, 1962] * * *." (Emphasis added.)

It therefore appears that the mutual general releases were just that: mutual general releases which were not limited in their scope to only domestic claims, but included any foreign claims then existing, especially if they were based, as here, on an essentially domestic issue—the fraudulent nature of a United States patent application. There can be no serious question here of coercion to accept the general release, since both parties were and are represented by competent counsel, and both parties exacted substantial concessions from each other. See e. g., Fabert Motors, Inc. v. Ford Motor Co., 355 F.2d 888, 890 (7th Cir. 1966); 31 I.L.P., Releases § 26. These general releases of antitrust claims are also not contrary to public policy. Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc., 208 F.2d 316, 324 (10th Cir.

---

4. Another one of the applications on file was the one involved in this suit, which ultimately became Kuffer (A.R.C.) '601, and the various foreign patents which were based thereon.

1953). Nothing contained in the recent Supreme Court case of United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), alters this court's view of the antitrust or release issues in this case.

Although the plaintiffs make claims to having causes of action that do not depend in great measure on the fraudulent United States application in 1956 (and Kuffer A.R.C. '601), this court is of the opinion that in the light of plaintiffs' admissions and the view this court takes of the May 7, 1962, agreement, these claims do not present a "genuine issue as to any material fact." Rule 56 (c). This court believes, therefore, that the requirements for the granting of a motion for summary judgment have been met. Cf. Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 356 F.2d 442, 446–448 (7th Cir. 1966).

It is ordered, therefore, that defendant's motion for summary judgment be and it is hereby granted, and the cause is hereby dismissed.